# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON


| | | |
|---|---|---|
| EARNEST ROTHGEB, | : | |
| Plaintiff, | : | |
| | | Case No. 3:08CV0115 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Earnest Rothgeb, a combat veteran of the Vietnam conflict, sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] with a protective filing date of March 10, 2003, alleging disability since July 12, 2002.  (Tr. 54-56).  He claims to be disabled due to Post-Traumatic Stress Disorder ["PTSD"], a stroke, and depression.  (Tr. 78, 87)

After initial denials of his application, Plaintiff was provided with an administrative hearing (Tr. 302-16), after which Administrative Law Judge ["ALJ"] Daniel R. Shell issued a written decision denying Plaintiff's application.  ALJ

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Shell based his decision on the conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 18-30). The ALJ's non-disability decision later became the Commissioner's final decision. Such decisions are subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff is due in the present case.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks an Order overturning the ALJ's decision and granting benefits, or at a minimum, remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

Plaintiff is a combat veteran who served in Vietnam from October 1968 to July 1969. (Tr. 120). He served in the United States Army from July 1966 to February 1973, then in the United States Air Force from February 1973 to December 1974. (Tr. 128, 270). A 56 year old when the ALJ issued his decision, Plaintiff is considered an individual of "advanced age" for purposes of resolving his DIB claim. *See* 20 C.F.R. § 404.1563(e); (*see also* Tr. 29). He has a high-school-equivalent education and one year of college. (Tr. 84). *See* 20 C.F.R. § 404.1564(b)(4). Following his military career, Plaintiff worked as a handyman, carpenter, roofer and contract inspector. (Tr. 70, 79, 88). He has not worked full time since July 2002. (Tr. 88).

During the ALJ hearing, Plaintiff testified that he felt he was disabled because of his inability to get along with people. "I couldn't keep a relationship and I couldn't keep a job. And I thought I was losing my ever-loving mind. And I didn't know what was going on." (Tr. 306). Plaintiff testified that he essentially has become a recluse. "I don't like people. I don't get along with people." (Tr. 308). Plaintiff indicated that he continued to see a therapist and a psychiatrist at the Veterans Administration Medical Center ["the VA"]. (*Id.*).

Plaintiff further testified that he spent 90 percent of his time at home watching television or taking care of his dog. (Tr. 309). He slept off and on most of the day. He went to the grocery store late at night about once a month because he didn't like people. (*Id.*) Plaintiff also testified that his medication changed frequently, because "[t]hey still haven't found out what works the best." (Tr. 309-10).

The remaining significant information in the administrative record consists of medical records and the opinions of several medical sources, summarized as follows:

Charles L. Walters, M.D. In October 1999, Plaintiff was screened for post-traumatic stress disorder ["PTSD"] due to his time in a combat zone in Vietnam. (Tr. 272-73). When he was evaluated by Dr. Walters, a physician in the Psychiatry Department at the VA, his affect was flat and his mood was depressed. He reported occasional intrusive thoughts and nightmares about Vietnam. Dr. Walters diagnosed Plaintiff with PTSD and prescribed medication and psychotherapy. (Tr. 270-71).

Frederick L. Peterson, Jr., Psy.D. Plaintiff began seeing Dr. Peterson, a psychologist with the VA, for individual psychotherapy on August 18, 2000. Plaintiff reported suspiciousness, intense periods of anger, high levels of anxiety, depressed mood and daytime intrusions of content from his combat experience. Dr. Peterson recommended the PTSD program at the VA but Plaintiff did not think he could tolerate being around other people. (Tr. 269).

In February 2001, Dr. Peterson noted that Plaintiff was isolating himself socially even from his favored family members. He further noted that Plaintiff sometimes would go three to four days without talking to others and spent inordinate amounts of time ruminating about violent scenarios regarding people and events that made him angry. (Tr. 266).

In March 2001, Dr. Peterson reported that Plaintiff's tendency toward social isolation was increasing, and that he had bothersome intrusive thoughts of combat. (Tr. 245).

In April 2001, in response to the VA's initial service-connected disability determination, Dr. Peterson sent a letter to the board providing additional information claimed to be needed as to Plaintiff's service record and symptoms. Dr. Peterson reported on Plaintiff's combat-zone PTSD and opined that Plaintiff was completely disabled due to PTSD. (Tr. 120-21).

In May 2001, Plaintiff reported to Dr. Peterson that he had to restrain himself from assaulting someone the previous week. "The only thing he described as stopping him[ ] was thought of los[ ]ing his freedom by going to prison." Dr. Peterson stated that Plaintiff was having particular difficulty with anger control, sleep disturbance, social isolation, and depression with suicidal thoughts. Dr. Peterson noted that during this appointment Plaintiff could not sustain eye contact, holding his head in his hands and abruptly leaving the session after 20 minutes. (Tr. 264).

In January 2002, Dr. Peterson reported that Plaintiff came to the session very angry and agitated. He had thoughts of killing a neighbor who had shot his dog. He also reported working on a construction site and getting so angry with a man that he had the urge to throw him off the roof. Plaintiff noted that the feeling was so strong that he had to leave the job site and drive away. (Tr. 256).

In May 2002, Plaintiff reported that he could not work due to his health and losing his contractor's insurance because of a lawsuit. Plaintiff reported being angry at everything and everyone. Even hearing a telephone ring made him angry. He had numerous suicidal and homicidal thoughts but stated that he would not act upon them. He had missed his last three medical appointments because "what does it matter." (Tr. 242).

In an undated letter, presumably written in August 2002, Dr. Peterson noted that Plaintiff routinely experienced impairment of both short-term and long-term memory. For example, Dr. Peterson noted that Plaintiff forgot about his daughter's wedding even though he was supposed to act as the father of the bride at the ceremony. Plaintiff often missed medical appointments because he was distracted and would forget about them.

Dr. Peterson noted that Plaintiff had many examples in his past of attempted "suicide by prox[ ]y," where he put himself in a position of potentially being killed by others. He also noted that Plaintiff had thoughts of killing his neighbor; had been involved in a physical altercation with his son, forgetting momentarily who his son was; and had left a work site in order to keep himself from throwing a co-worker off the roof. Dr. Peterson used these examples to demonstrate Plaintiff's impaired thought processes. "I hope these examples help make more clear the full extent and severity of [Plaintiff's] impairment from PTSD secondary to his service in the Republic of Vietnam." Dr. Peterson opined that Plaintiff was "totally and permanently disabled as well as unemployable. The fact that Plaintiff declares himself 'self employed' is only because he does not have the capacity and tolerance to work with others, let alone any authority figure such as a supervisor." (Tr. 122-24).

Plaintiff returned to Dr. Peterson on February 9, 2004. He reported going to bed every night "praying that the Lord allow me not to wake up." He felt he was having trouble with the Remeron prescription because it did not last through the afternoon and his anger increased. He reported that a few days earlier he had come home to find his dog chewing his [AA] Big Book, "and I went black. I grabbed that [80 pound] dog with one hand and threw him against the wall. Before he bounced off the wall and hit the floor, I was already on him. I am afraid of what would have happened if that were a man." Dr. Peterson noted that Plaintiff was able to sustain eye contact but that most the time his eyes were averted. Dr. Peterson noted Plaintiff continued to struggle with severe PTSD symptomology and was very isolated. (Tr. 205-06).

Plaintiff returned to Dr. Peterson on February 24, 2004, noting that he still didn't know why he "should get out of bed in the morning. I don't seem to have any meaning in my life now. I am mean and a bastard to be around." Dr. Peterson noted Plaintiff had a flat affect with no emotion, but his eye contact was increased and he was able to

concentrate.  Plaintiff also was depressed due to a recent relationship breakup.  Dr. Peterson thought Plaintiff was somewhat improved from the prior meeting.  (Tr. 203).

During his March 19, 2004 appointment, Dr. Peterson observed that Plaintiff appeared agitated, was picking at skin on his hands, wringing his hands, shifting in his seat, and making limited eye contact.  Plaintiff was planning a trip to Florida "to get away awhile before I do something I don't want to do."  (Tr. 198).  Following this appointment, Dr. Peterson opined that Plaintiff was disabled due to PTSD.  He indicated that Plaintiff's was "one of the most severe cases of disability" he had witnessed in his 20 years of experience working with disabled veterans.  (Tr. 184).

In April 2004, Plaintiff told Dr. Peterson that he was doing better and was going to Florida to visit his sister.  Dr. Peterson reported that Plaintiff's depressive symptoms were diminished to some degree as he was more interested in being around others and was more active.  (Tr. 195).

Judith A. Sigmund, M.D.  When Plaintiff first saw VA psychiatrist Dr. Sigmund in January 2001, his affect and mood were noted as irritable.  Dr. Sigmund diagnosed PTSD and alcohol dependence, in remission.  She assigned a Global Assessment of Functioning ["GAF"] of 55.  (Tr. 267).  Through 2001 and early 2002, Dr. Sigmund continued to rate Plaintiff's GAF at 55 and to adjust his medications.  (Tr. 243, 247, 258, 263, 265).

When Plaintiff saw Dr. Sigmund on July 1, 2002, he reported being angry and tired all the time.  He was feeling depressed and had lost his faith in humanity.  Dr. Sigmund recommended continued psychotherapy.  She diagnosed PTSD and assigned a GAF of 50.  (Tr. 238-39).

Dr. Sigmund saw Plaintiff again in September 2003, after more than a year's absence from treatment.  Plaintiff apparently had gone traveling for several months and had not returned to the VA.  Plaintiff reported feeling depressed for the past six months and currently having no desire to do things.  He indicated that he was sleeping 16 to 18 hours each day.  Plaintiff also reported that he recently had been kicked out of three

motorcycle shops and was not welcome back. He wanted to go to Florida again but knew he could not obtain health care in Florida. On mental status examination, Plaintiff's affect and mood were angry. He frequently interrupted the interviewer. He was slouching in his chair. Dr. Sigmund continued a GAF of 50. She recommended increasing his antidepressant medication, Sertraline [Zoloft]. She advised Plaintiff to return to seeing Dr. Peterson for individual psychotherapy. (Tr. 227-28).

In December 2003, Plaintiff reported that another physician at the walk-in clinic had weaned him off the Sertraline and started him on Mirtazapine [Remeron] because he was having problems with sexual functioning. Plaintiff felt that the medication was helping his sleep but he still became angry in the afternoon. Dr. Sigmund noted that Plaintiff's affect and mood were angry. He was tapping his fingers throughout the interview. She continued the diagnosis of PTSD and borderline personality disorder and assigned a GAF of 50. She increased the Mirtazapine dosage. (Tr. 219).

In March 2004, Dr. Sigmund made adjustments to Plaintiff's medication to address complaints of irritability. He again reported that the Mirtazapine helped him to sleep but that he was still very angry in the afternoon. Plaintiff also felt that his life lacked meaning and he didn't care. (Tr. 200).

In June and August 2004, situational stressors led Dr. Sigmund to increase Plaintiff's Mirtazapine. (Tr. 290, 293).

When Dr. Sigmund saw Plaintiff in September 2004, she noted that Plaintiff was rather agitated when he came into the room. His face was flushed. When he sat down, Dr. Sigmund noted his knees bounced up and down. Plaintiff reported anxiety related to his recent relationship break up. Dr. Sigmund diagnosed adjustment disorder and PTSD and assigned a GAF of 45. She continued his medications but she replaced Vistaril with Clonazepam. (Tr. 282-83).

Nancy E. McCarthy, Ph.D.  Dr. McCarthy, a state agency reviewing psychologist, indicated in October 2003 that there was insufficient evidence for the period from July 12, 2002, through September 17, 2003, on which to form an opinion.  (Tr. 154).

After September 2003, Dr. McCarthy found Plaintiff to be "a generally disagreeable individual" who was not medication compliant.  She continued:

> He reptd in 7/02 that rx was working and went traveling in his camper for 3 months.  He had agreed to ret to VA in 3 months, which did not happen.  His presentation at the VA is sporadic and he seems to want them to fix things without his cooperation.  He complained of not getting along with others, which is accurate due to his demeanor.  There is no convincing picture of disability established, as his visits to the VA are so irregular.

(Tr. 183).  Dr. McCarthy found that there was no known history of interpersonal violence; Plaintiff "is just verbally reactive."  (*Id.*).

Dr. McCarthy opined that Plaintiff had a mild restriction in his activities of daily living and a moderate degree of limitation in maintaining social functioning and in maintaining concentration, persistence or pace.  Dr. McCarthy did not believe that Plaintiff had repeated episodes of decompensation.  Dr. McCarthy thought that Plaintiff was markedly limited in his ability to interact appropriately with the general public.  In addition, Dr. McCarthy noted that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; and to respond appropriately to changes in the work setting.  Dr.

McCarthy concluded that Plaintiff could function in settings without strict time pressures. She also reported that socially, Plaintiff could "complete nonpersonal tasks in nonpublic settings where minimal interpersonal interactions are expected." She thought that Plaintiff would need a predictable work setting and that "routinized tasks would prevent his reactivity from being a problem." (Tr. 168-83).

Benjamin Harrison, LISW. Plaintiff was seen by therapist Harrison on November 17, 2003. He reported relationship struggles with a woman who recently had left him. Therapist Harrison observed that Plaintiff appeared depressed and despondent over the situation. Affect was depressed and mood was low. (Tr. 225-226). Plaintiff continued therapy regarding his anxiety associated with PTSD and his depression over the break up of his relationship. (Tr. 220-25).

Plaintiff was seen in crisis by therapist Harrison on August 12, 2004, because of problems with his girlfriend. Plaintiff stated that he felt paralyzed and afraid of being alone. (Tr. 289).

On August 29, 2004, Plaintiff was seen in the Emergency Room because of increased anxiety attacks after the breakup of a relationship. Plaintiff had passing thoughts of hurting himself but was not actively suicidal. He was given a course of Vistaril for anxiety and discharged. (Tr. 287). When he was seen in psychiatry the next day, he reported that the Vistaril did not help. He also noted that this was the second time his girlfriend had left him and that she claimed it was due to his antisocial behavior. (Tr. 285). The psychiatrist increased the Vistaril. (*Id.*).

In September 2004, Plaintiff admitted to therapist Harrison that he continued to obsess over the woman, even driving by her house. (Tr. 281-82).

Plaintiff called therapist Harrison tearful and incoherent in early October 2004. (Tr. 278).

Richard D. Sanders. M.D. In September 2004, Plaintiff was seen by Dr. Sanders, a staff psychiatrist at the VA. He noted that Plaintiff was overtly anxious, flushed,

dysphoric and had obsessive thoughts about his former girlfriend.  Dr. Sanders diagnosed depression and PTSD, and assigned Plaintiff a GAF of 40.  (Tr. 280-81).

In October 2004, Dr. Sanders reported that Plaintiff had intense anxiety and severe loss of function since the last appointment.  Dr. Sanders diagnosed depression and PTSD, and rated Plaintiff's GAF at 35.  He adjusted Plaintiff's medications, including discontinuing Clonazepam, which did not help.  (Tr. 277-78).

## III. ADMINISTRATIVE REVIEW

### A. <u>Applicable Standards</u>

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" as defined by the Social Security Act has specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability"includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.[2]  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."[3]

Social Security regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4); (*see also* Tr. 18-30).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?

---

[2]Impairments also must be expected either to cause death or last 12 months or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

[3]*Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

2.       Does the claimant suffer from one or more severe impairments?

3.       Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.       Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.       Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

ALJ Shell found at Step 1 of the sequential evaluation that Plaintiff had not engaged in substantial gainful activity since his claimed disability onset date of July 12, 2002. (Tr. 23, 28). He found at Step 2 that Plaintiff has the severe impairment of an anxiety-related disorder. (*Id.*). At Step 3, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulation No. 4. (Tr. 24, 28).

At Step 4 the ALJ found that Plaintiff is capable of performing work at any defined level of exertion ranging from very heavy to sedentary, but is restricted to performing low-stress job duties (*i.e.*, no direct dealing with the general public, no production quotas, and no close "over-the-shoulder" supervision). (Tr. 28-29). The ALJ further found that Plaintiff is unable to perform his past relevant work, but based on the vocational expert's testimony, found there to be a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 29). This assessment, along with

the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB.  (Tr. 30).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings, and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance . . .'"  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The required analysis also is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    DISCUSSION

Plaintiff contends that the ALJ failed to properly weigh the opinion of his treating psychologist, Dr. Peterson. Plaintiff also contends the ALJ did not include all of state agency reviewing physician Dr. McCarthy's limitations in his residual functional capacity evaluation.

Resolving the parties' contentions begins with the standards used by ALJs to weigh the various medical source opinions in the administrative record. The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, an examining physician who saw the claimant only once, or a medical advisor who testified before the ALJ. *Wilson*, 378 F.3d at 544; *see Lashley v. Secretary of Health & Human Servs.,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. § 404.1527 (d) (2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); 20 C.F.R. § 404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)(2)).

In general, more weight is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d) (1). However, the opinions of non-examining state agency medical consultants have some value, and under some circumstances can be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians

and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, the opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians, including supportability, consistency and specialization. *See* 20 C.F.R. § 404.1572(d), (f).

Plaintiff reasons that the ALJ failed to weigh Dr. Peterson's opinion as required by the Regulations. (Doc. # 8 at 14). The Commissioner maintains that the ALJ properly evaluated the medical source opinions of record and correctly found that Dr. Peterson's opinion could not be given controlling, or even great weight, because it was not medically well supported and was inconsistent with the other substantial evidence of record. (Doc. #9 at 7).

The ALJ based his assessment of Plaintiff's residual functional capacity with a restriction to performing low-stress job duties (*i.e*., no direct dealing with the general public, no production quotas, and no close "over-the-shoulder" supervision) on Dr. McCarthy's opinion of October 2003. (Tr. 168-83). The ALJ explained:

> According to evaluating psychologist Dr. McCarthy, there is no convincing picture of disability. (Exhibit 5F at 16). In the opinion of Dr. McCarthy, the claimant can function in settings without strict time pressures. He is able to function effectively in non-public settings where minimal interpersonal interactions are expected. (Exhibit 5F at 16). The vocational situation described by Dr. McCarthy is adequately addressed by restricting the claimant to performing low-stress job duties. Veterans Administration mental health treatment records describe the claimant as friendly and cooperative. He was alert and fully oriented. (Exhibit 7F at 86). It was reported that the claimant's thought process was "linear and logical." Cognition was "grossly intact." (Exhibit 7F at 83). With consideration of the necessity for a low-stress work environment, it is found that the claimant retains the capacity to perform work involving any defined level of exertion. There is no substantial evidence of any other "severe"

impairment that would warrant additional functional
limitations.

(Tr. 24-25).

The ALJ rejected Dr. Peterson's opinion, as follows:

> The extent of functional limitation described by Dr. Peterson
> has no support in objective medical evidence or clinical
> findings. Furthermore, it is inconsistent with the findings of
> Dr. McCarthy as well as mental health treatment records. The
> record does not show evidence of abnormality that would
> account for the degree of functional limitation described by
> Dr. Peterson. According to Dr. McCarthy, the claimant
> experiences a "mild" degree of limitation in his ability to do
> activities of daily living. He experiences a "moderate" degree
> of limitation in his ability to maintain social functioning. He
> experiences a "moderate" degree of limitation in his ability to
> maintain concentration, persistence, or pace. (Exhibit 5F at
> 11). Dr. McCarthy stated that there is no convincing evidence
> of disability. (Exhibit 5F at 16). Consequently, it is found
> that the degree of limitation described by Dr. Peterson is not
> substantiated by the weight of the evidence. That degree of
> limitation cannot be considered credible. The claimant may
> have some functional limitations associated with an anxiety
> disorder, but the weight of the evidence of record does not
> establish that such impairment would render the claimant
> totally disabled from all work activity.

(Tr. 21-22).

Plaintiff is correct in urging that the ALJ erred by applying only the standards to
determine if Dr. Peterson's opinion was entitled to controlling weight under the treating
physician rule, but failing to apply the remaining factors required by the Regulations.
The Regulations require that a treating physician's opinion be accorded controlling
weight to only when it is both well supported by medically acceptable evidence and not
inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see
Walters*, 127 F.3d at 530; 20 C.F.R. § 404.1527(d)(2). Because the ALJ did apply these

factors in considering Dr. Peterson's opinion, the ALJ did not err as a matter of law in declining to give controlling weight to Dr. Peterson's opinion.

The ALJ did err as a matter of law, however, by not continuing to weigh Dr. Peterson's opinion under the remaining factors set forth in the Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544. The ALJ did not specifically refer to any of these factors when weighing Dr. Peterson's opinion. Speaking through the Rulings, the Commissioner instructs:

> Adjudicators must remember that a finding that a treating source's medical opinion is not well-supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p. Because the ALJ did not heed this instruction or the requirements of the Regulations, his evaluation of Dr. Peterson's opinion was based on an error of law.

Moreover, even if we were to assume, to the Commissioner's benefit, that the ALJ applied the correct legal criteria in evaluating the opinion of Dr. Peterson, the ALJ's factual findings are not supported by substantial evidence. The ALJ clearly relied on isolated notations from Plaintiff's treatment records as grounds for determining that "the evidence does not support the finding of treating psychologist Dr. Peterson that the claimant is rendered 'disabled' and 'unemployable' by the effects of an anxiety disorder."

(Tr. 22). For example, the ALJ apparently based his conclusion that VA records "describe the claimant as friendly and cooperative . . .alert and fully oriented" on a single entry from the notes of Dr. Walter's August 2000 examination. (*See* Tr. 21) (quoting, in part, Tr. 270). The ALJ also drew from Dr. Sigmund's January 2001 treatment notes for the proposition that "the claimant's thought process was 'linear and logical'," and that "[c]ognition was 'grossly intact'." (*Id.*) (quoting, in part, Tr. 267). The ALJ's selective recitations from these notes, however, does not accurately capture the full factual context in which they were written – mainly, that of Plaintiff's chronic PTSD.

A more comprehensive reading of Plaintiff's medical records reflects that when he first was evaluated in the VA's psychiatric department, Plaintiff's affect was flat and his mood was depressed. He reported occasional intrusive thoughts and nightmares about Vietnam. (Tr. 270). Dr. Sigmund's January 2001 treatment notes also reflect that Plaintiff's affect and mood were deemed irritable. (Tr. 267). In addition, when Plaintiff saw Dr. Sigmund in July 2002, she noted that Plaintiff continued to be very angry, and reported being angry and tired all the time. He was feeling depressed and had lost his faith in humanity. (Tr. 238-39). In September 2003, Dr. Sigmund again reported that Plaintiff's affect and mood were angry. He frequently interrupted her during that session. She increased his medication. (Tr. 228).

By ignoring these notes, and focusing instead on other notes taken out of context, the ALJ erred. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (ALJ "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position"); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984) ("Secretary's attempt to use only the portions [of a medical report] favorable to her position, while ignoring other parts, is improper"); *Hawke v. Astrue*, No. 3:07cv00108, 2009 WL 961783, at *3 (S.D. Ohio Apr. 8, 2009) (Rose, J.). There remains the possibility that the ALJ's described errors in failing to apply the required legal criteria might be considered harmless. *See Bowen*, 478 F.3d at 747-49. However, "[a] court cannot excuse the denial

of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Wilson*, 378 F.3d at 546. The Court there continued:

> '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.' To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'

*Id.* (internal citations omitted).

The ALJ's error here was not harmless, because the record contained other PTSD diagnoses from Plaintiff's other VA treating physicians. (*See* Tr. 21). Treating psychiatrist Dr. Sigmund diagnosed PTSD and initially assigned a GAF of 55. (Tr. 267). Plaintiff accurately argues that his GAF rating continued to decline over time. (*See* Doc. #8 at 15). In July 2002, Dr. Sigmund continued the diagnosis of PTSD and assigned Plaintiff a GAF of 50. (Tr. 239). By September 3, 2004, Dr. Sigmund diagnosed Plaintiff with an adjustment disorder and PTSD and assigned a GAF of 45. (Tr. 282-83). In September 2004, Dr. Sanders assigned Plaintiff a GAF of 40. (Tr. 281). On October 8, 2004, Plaintiff's GAF score was 35. (Tr. 277).

Plaintiff further suggests that the ALJ's conclusion cannot be reconciled with the VA's decision to grant Plaintiff a 100 percent disability rating, based on Dr. Peterson's opinion. (Doc. #8 at 15-16). The Social Security regulations provide that the decision of another governmental agency is not binding on the Commissioner, stating as follows:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind

is based on its rules and is not our decision about whether you
are disabled or blind. We must make a disability or blindness
determination based on social security law. Therefore, a
determination made by another agency that you are disabled
or blind is not binding on us.

20 C.F.R. § 404.1504. Although the VA's decision therefore is not binding on the

Social Security Administration, the Commissioner nonetheless at least must consider it.

*See, e.g., McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (ALJ's failure even

to mention VA's disability finding in his opinion constituted error). While there is no

consensus among the circuits as to how much weight another governmental agency's

decision should receive, all circuits at minimum require the ALJ to consider the other

agency's decision. *See id.*; *see also* Carolyn A. Kubitschek, *Social Security Disability,*

*Law and Procedure in Federal Court* § 2:43 (1994, Supp. 2007). By implication, the

Sixth Circuit, too, would require an ALJ to consider a disability decision of the Veterans

Administration and to articulate reasons for the amount of weight he or she assigns to that

decision. *See Harris v. Heckler*, 756 F.2d 431, 434 (6th Cir. 1985) (terming it "somewhat

strange that . . . the Secretary would have the audacity to claim [that DIB claimant] was

not disabled," where "other responsible agencies" had allowed Black Lung and Workers'

Compensation benefits); *Stewart v. Heckler*, 730 F.2d 1065, 1068 (6th Cir. 1984)

(explicitly noting, in remanding social security claim for award of benefits, that

administrative record reflected "a Veterans Administration insurance disability award

marked 'total disability'").

The broader academic and practitioner consensus concurs in that position. *See,*

*e.g.*, Harvey L. McCormick, *Social Security Claims and Procedures* §8:49 (5th ed. 1998,

Supp. 2007). Furthermore, the Social Security Administration has ruled that an

adjudicator should explain the consideration given to disability decisions made by

governmental and nongovernmental agencies. SSR 06-03p.

The ALJ erred in failing to consider the Veteran Administration's decision to grant

Plaintiff complete disability status. The ALJ was not bound by the decision of the

Department of Veterans Affairs. *See* 20 C.F.R. §404.1504. However, he at least should have considered the decision and articulated his reasons for rejecting it. *See McCartey*, 298 F.3d at 1075-76; SSR 06-03p. There is no indication in the October 6, 2005 decision that the ALJ considered the Department of Veterans Affairs' decision granting Plaintiff total disability status due to PTSD. (Tr. 125-37).

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Peterson's opinions are well taken.[4]

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g), due to the problems identified above. On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; (2) consider the disability decision of

---

[4] In light of the above review, and the resulting need for remand of this case, an in-depth analysis of the parties' other contentions is unwarranted.

the Department of Veteran Affairs; and (3) determine anew whether Plaintiff was under a disability and thus eligible for DIB during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT THEREFORE IS RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Ernest Rothgeb was under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.  The case be terminated on the docket of this Court.

April 16, 2009
                                    s/ Sharon L. Ovington
                                    Sharon L. Ovington
                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).